# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PEKAH WALLACE,
    *Plaintiff*,

    v.

CHERYL SHARP, in her official and
individual capacities, TANYA HUGHES,
in her official and individual capacities,
and CONNECTICUT COMMISSION ON
HUMAN RIGHTS AND OPPORTUNITIES,
    *Defendants*.

No. 3:19cv391 (MPS)

## RULING ON MOTION TO DISMISS

Plaintiff Pekah Wallace brings this action against her former employer, the Connecticut Commission on Human Rights and Opportunities ("CHRO"), and its Executive Director Tanya Hughes and Deputy Executive Director Cheryl Sharp, in both their individual and official capacities. Wallace alleges retaliation of her First Amendment rights, violation of her right to Equal Protection, and various state law claims. The Defendants move to dismiss. (ECF No. 14.)

As a threshold matter, Wallace concedes that the motion to dismiss should be granted as to count 1 alleging violation of Conn. Gen. Stat. § 31-51q, count 3 as to the CHRO alleging violation of Equal Protection, and count 5 alleging a state law claim of tortious interference with contractual rights. *See* ECF No. 19 at 6 n.3 (count 1), at 5 n. 2 (count 3 as to CHRO), and 6 n.3 (count 5). Accordingly, these claims are dismissed. Further, any claims against the individual defendants in their official capacities for money damages also are dismissed on the basis of Eleventh Amendment immunity.

The remaining counts allege First Amendment retaliation (count 2), violation of Equal Protection (count 3), and the state law torts of intentional infliction of emotional distress (count 4)

and defamation (count 6).  For the reasons that follow, the motion to dismiss is GRANTED IN PART and DENIED IN PART.

## I.     FACTS

The following facts, taken from Wallace's complaint (ECF No. 1), are treated as true for the purposes of the motion to dismiss.

Wallace was employed by the CHRO for more than 21 years in a variety of professional capacities.  (ECF No. 1 at ¶ 9.)  For more than ten years, she was the manager of the Waterbury Regional office and maintained a standard of timely case closures and monetary recoveries for complainants "at the highest professional level."  (Id.)  In 2013, she was appointed manager of the Capitol Region office.  (Id.)  In her new role, Wallace oversaw an increase in productivity.  From July 1, 2013 to June 30, 2014, the Capitol Region reduced the number of "aged" cases from 52 to 12.  (ECF No. 1 at ¶ 16.)  In addition, the Capitol Region investigated and resolved 500 cases, a record number of closures for the Capitol Region.  (Id.)  In comparison, the Waterbury Office closed 346 cases, the Bridgeport office closed 219 cases, and the Norwich office closed 322 cases. (Id.)

The following year, Wallace's staff investigated and resolved 539 cases, which again was the highest closure rate among the regions.  (ECF No. 1 at ¶ 17.)  These closure results were due in large measure to Wallace's hard work and effective management.  (Id.)  Wallace consistently was the top performing regional manager in the CHRO.  (ECF No. 1 at ¶ 19.)

By the end of fiscal year 2013/2014, the Capitol Region had closed approximately 593 cases, 102 of which were cases that had been transferred to the Capitol Region from other regions. (ECF No. 1 at ¶ 22.)  The 102 transferred cases were reviewed, evaluated, processed, and closed by Capitol Region staff under Wallace's supervision.  (Id.)

CHRO's case tracking system ("CTS") was unable to attribute cases properly that had been transferred to the Capitol Region from other regions. (ECF No. 1 at ¶ 23.) The system therefore understated the number of cases the Capitol Region closed. (ECF No. 1 at ¶ 26.) Executive Director Tanya Hughes and Deputy Executive Director Cheryl Sharp used these inaccurate case closure reports that effectively reduced the Capitol Region's case closures by 102 cases and increased the other regions' closures by varying amounts that totaled 102 cases. (ECF No. 1 at ¶ 24.) Wallace thought the reports were not accurate because they did not acknowledge all the cases closed by the Capitol Region. (ECF No. 1 at ¶ 25.) Although the secretaries of the respective regions manually prepared accurate monthly reports, Hughes and Sharp instead relied on and used the inaccurate CTS reports. (ECF No. 1 at ¶ 26.)

From May 2014 to September 2014, Wallace challenged Sharp and Hughes about the inaccurate reports which were created for internal and external dissemination. (ECF No. 1 at ¶ 26.) Wallace sent emails to Sharp and Hughes protesting their use of inaccurate data. (ECF No. 1 at ¶¶ 27, 28, 29.) Sharp told Wallace it was none of her concern. (ECF No. 1 at ¶ 28.)

The CHRO uses case closure reports to measure the success of the various regions. (ECF No. 1 at ¶ 31.) In addition, Connecticut's General Assembly evaluates the CHRO regions' productivity and claim frequency in assessing, among other things, whether to close particular regional offices and in fashioning legislation addressing CHRO case processing. (ECF No. 1 at ¶ 31.) A subsequent investigation by the General Assembly's Legislative Program Review and Investigations Committee found that Wallace's complaints were correct in that the CTS was under-reporting the aged cases in the regions and not reporting aged cases assigned to the Legal Division. (ECF No. 1 at ¶ 32.)

Sharp and Hughes were angered by Wallace's objections to their dissemination of inaccurate case closure reports. (ECF No. 1 at ¶ 34.) Sharp told Wallace that the reports were not her concern. (Id.)

<u>September 2014 investigation</u>

At a staff meeting on September 18, 2014, Wallace told her staff that the CTS system was broken and that cases transferred to and resolved by the Capitol Region were never transferred from the databases of other transferring regions. (ECF No. 1 at ¶ 35.) As a result, the resolutions of those cases were incorrectly credited to the transferring regions. (Id.). Wallace further explained that although the CTS reports were incorrect, the Capitol Region was reporting accurate data to the administration. (ECF No. 1 at ¶ 36.) A few days later, on September 22, 2014, Sharp told Wallace that she would be at the Capitol Region the following day to investigate whether Wallace had stated during the staff meeting that the Legal Department was "stealing" credit for the Capitol Region's cases. (ECF No. 1 at ¶ 37.) Wallace denied using the term "stealing" and explained what she actually said during the staff meeting. Wallace stated that her concerns over the inaccurate reporting of the Capitol Region's performance for many months were no secret and she questioned the point of such an "investigation." (ECF No. 1 at ¶ 38.) On September 23, 2014, Sharp and Hughes appeared at the Capitol Region. They placed everyone in the office under oath and subjected them to lengthy interrogations, which disrupted the office, intimidated the staff, and undermined Wallace's position as the Regional Manager. (ECF No. 1 at ¶¶ 39, 40.) Sharp and Hughes interrogated Wallace's administrative assistant, Debra Morris, who refuted the allegation against Wallace. (ECF No. 1 at ¶ 41.) They then told Morris that they were cutting her overtime hours in half. (ECF No. 1 at ¶ 42.) On October 6, 2014, Wallace reported this unnecessary and harassing "investigation" to the Department of Labor ("DOL"), which serves as the human

resources department for the CHRO.  The DOL advised Wallace that it was improper to place staff

under oath in that type of investigation.  (ECF No. 1 at ¶ 44.)  Wallace notified the DOL that Sharp

and Hughes had refused to pay Dedra Morris for time she worked in May calculating case closures.

(ECF No. 1 at ¶ 45.)  The DOL directed that the CHRO pay Ms. Morris for her work.  (Id.)

On October 2, 2014, Sharp and Hughes appeared in Wallace's office unannounced,

intending to interrogate her.  (ECF No. 1 at ¶ 46.)  They entered her office without knocking while

her back was turned.  (Id.)  Their unannounced appearance in her office with intent to conduct a

lengthy interrogation demonstrates their disregard for professional office interactions in favor of

inflicting unwarranted stress and harassment on Wallace.  (Id.)  On November 13, 2014, Wallace

submitted a Freedom of Information request to the CHRO seeking documentation relating to the

"investigation" and copies of any complaints against her.  (ECF No. 1 at ¶ 47.)  Sharp and Hughes

did not respond.  (Id.)

Felipe M. Complaint 2014

On November 20, 2014, Felipe M., a complainant, met with Daniel Salerno, an investigator

and union steward assigned to the Capitol Region.  (ECF No. 1 at ¶ 48.)  Salerno encouraged and

assisted Felipe in preparing a complaint against Wallace alleging that she (1) prevented Mr. M.

from filing any amended discrimination complaints, and (2) bullied and bad-mouthed Mr. M. and

employees in the Capitol Region office.  (Id.)  Salerno gave the complaint against Wallace (which

he helped Mr. M. prepare) to Sharp, who filed the complaint with the DOL, despite knowing it

was unfounded.  (ECF No. 1 at ¶ 52.)  Although Mr. M. stated in his complaint that Wallace denied

him the opportunity to file an amended complaint, Mr. M. in fact had filed an amended complaint

on November 20, 2014.  (ECF No. 1 at ¶ 53.)  On November 25, 2014, Sharp emailed Wallace that

she had received a complaint from Felipe M. that Wallace had prevented him from filing an

amended complaint.  (ECF No. 1 at ¶ 54.)  Wallace responded that Mr. M. had filed an amended complaint, which she attached, and that she had had no interactions with him aside from saying "hello."  (ECF No. 1 at ¶ 55.)  Sharp forwarded Mr. M.'s complaint to the DOL for investigation without including Wallace's response or advising the DOL that she had proof that Mr. M. had filed an amended complaint.  (ECF No. 1 at ¶ 56.)  Although she knew that Mr. M. had in fact filed an amended complaint, Sharp chose to subject Wallace to a formal DOL investigation regarding allegations she knew had no merit.  (ECF No. 1 at ¶¶ 59, 61.)  On December 30, 2014, the DOL notified Wallace that it was investigating her but did not disclose the nature of the complaint or the person who filed it.  (ECF No. 1 at ¶ 57.)  Wallace asked Hughes if she knew what the investigation was about and Hughes disingenuously claimed she did not.  (ECF No. 1 at ¶ 58.)  The DOL did not reveal the nature of the complaint until DOL representatives met with Wallace on January 16, 2015 and told her that the investigation related to a complaint filed by Felipe M.  (ECF No. 1 at ¶ 57.)  The DOL did not issue a report regarding its investigation despite the fact that the complaint had no merit.  (ECF No. 1 at ¶ 62.)  Despite the lack of an investigative report, Sharp used Mr. M's complaint to issue Wallace a poor performance review.  (ECF No. 1 at ¶ 63.)  Specifically, Sharp stated in Wallace's review that there had been complaints from the public and that there were several on-going investigations being conducted into Wallace's actions regarding members of the staff and the public.  (ECF No. 1 at ¶ 64.)  Wallace grieved the performance review.  Sharp conceded that she had relied on the complaint by Mr. M. and the investigation she initiated to support the negative performance review.  There were no other complaints from the public.  (ECF No. 1 at ¶¶ 65 - 66.)

<u>Investigation into Wallace's attendance - April 2015</u>

In April 2015, Wallace learned that an investigator in the Capitol Region office was

conducting a personal real estate business on state time using his state computer. (ECF No. 1 at ¶ 67.) Wallace brought the matter to Sharp's attention but Sharp did not get back to her. (ECF No. 1 at ¶ 68.) Wallace issued an email about "office protocol." (ECF No. 1 at ¶ 69.) Sharp questioned Wallace about it. (ECF No. 1 at ¶ 70.) In response, Wallace explained that she had told Sharp about an individual using his work computer for non-work activity but that nothing had been done. (ECF No. 1 at ¶ 72.) No investigation was conducted into the employee who was performing personal work on state time using his state computer. (ECF No. 1 at ¶ 73.) Sharp's response was to order an investigation into Wallace's attendance. (ECF No. 1 at ¶ 74.)

Complaint by Daniel Salerno – June 2015

On June 19, 2015, after reviewing a draft investigative summary prepared by Daniel Salerno, Wallace made changes that caused the formatting of the document to shift. (ECF No. 1 at ¶ 75.) She and Dedra Morris, her administrative assistant, worked on the document. (ECF No. 1 at ¶¶ 75 - 76.) Salerno complained to Sharp that he had overheard Wallace making comments to Morris about his performance. (ECF No. 1 at ¶ 77.) Sharp in turn appeared at the Capitol Region on June 21, 2015 and proceeded to interrogate Wallace and her staff for two days about the issue. (ECF No. 1 at ¶ 79.) Wallace explained to Sharp what had taken place and that Salerno could not possibly have overheard any discussion of his performance because no such discussion has taken place. (ECF No. 1 at ¶ 80.)

Salerno complained to Sharp about Wallace's suggested revisions to the investigative summary. (ECF No. 1 at ¶ 82.) Sharp told Wallace to meet with her and Salerno but did not tell her the purpose of the meeting. (ECF No. 1 at ¶ 84.) When the meeting began, Wallace realized the purpose and objected to being questioned about her review of Salerno's work in front of him. (ECF No. 1 at ¶ 85.) Sharp cut Wallace off, left the room and returned with an administrative

assistant who sat in on the meeting. (ECF No. 1 at ¶ 85.) Sharp did not permit Wallace to explain her objections. (ECF No. 1 at ¶ 85.) In conducting the meeting in this manner, Sharp undermined Wallace's authority as a manager in front of Salerno and the administrative assistant. (ECF No. 1 at ¶ 86.) Sharp had not discussed with Wallace her revisions to the draft. (ECF No. 1 at ¶ 87.) Upon review, Sharp agreed with Wallace that a particular portion was "conclusory" and explained to Salerno what was wrong. (ECF No. 1 at ¶¶ 89, 90.) Salerno muttered and went on an extended diatribe but Sharp did not respond to his insubordination. (ECF No. 1 at ¶ 90.)

<u>Response to J.C. Complaint - 2016</u>

In May 2016, because of the aggressive and threatening behavior exhibited by J.C., a frequent complainant, Wallace instituted a safety procedure requiring him to submit his notarized CHRO complaints to the Capital Region by mail and restricting his access to the office. (ECF No. 1 at ¶¶ 92 - 93.) Sharp and High knew about the procedure and concurred. (ECF No. 1 at ¶ 93.) In July 2016, Sharp had someone call Wallace to ask why the Capitol Region office would not meet with J.C. to notarize his complaints. (ECF No. 1 at ¶ 94.) Wallace explained the safety procedure. (ECF No. 1 at ¶ 95.) Thereafter, J.C. appeared at the Capitol Region office with 2 un-notarized complaints. (ECF No. 1 at ¶ 96.) Wallace declined to send a staff member down to meet with him. (ECF No. 1 at ¶ 96.) Sharp interrogated Wallace, demanding to know which investigators had complained about J.C. and implied that there were no such complaints. (ECF No. 1 at ¶ 97.) Although J.C.'s complaint had no merit, Sharp and Hughes referred it to the DOL for a formal investigation into Wallace. (ECF No. 1 at ¶ 98.) On August 12, 2016, Wallace filed a formal complaint with the CHRO's Board of Commissioners regarding unsafe working conditions and retaliation by Sharp and Hughes based on their handling of the J.C. complaint. (ECF No. 1 at ¶ 99.) The Board did not take any action. (ECF No. 1 at ¶ 100.)

<u>Charles Perry incident - 2017</u>

On April 24, 2017, Charles Perry, a paralegal in the CHRO's legal department, filed a complaint with Sharp and Hughes that Wallace had been rude to him. (ECF No. 1 at ¶ 101.) Sharp sent Wallace an email about the complaint, directing her to provide an account of her interaction with Perry. (ECF No. 1 at ¶ 102.) Wallace immediately responded. (Id.) On April 28, 2017, Sharp and Hughes embarked on a full scale investigation, interrogating Wallace and her staff for several hours. (ECF No. 1 at ¶ 103.) Sharp repeated her questions to Wallace numerous times. (ECF No. 1 at ¶ 104.) In response to Sharp's interrogation, Wallace had an anxiety attack, to the point where she needed to seek medical advice. (ECF No. 1 at ¶ 105.) Sharp returned with Hughes to finish the interrogation. They spent approximately an hour questioning Wallace, often simultaneously, without any regard for Wallace's well-being. Hughes commented, "This is not Pekah's little sanctuary." (ECF No. 1 at ¶ 106.) On May 1, 2017, Sharp issued Wallace a "Counseling Memorandum for Job Performance" in which she accused Wallace of unsatisfactory performance, failure to follow a directive to answer simple, routine questions during her investigation of the Charles Perry matter, and insubordination. (ECF No. 1 at ¶ 107.) Sharp further stated that Wallace demonstrated a lack of cooperation during the investigation and accused Wallace of "unnecessary escalation" and "simulated crying." (ECF No. 1 at ¶ 107.) On May 4, 2017, Sharp and Hughes issued Wallace a second "Written Counseling Memorandum for Job Performance" relating to her interaction with Charles Perry. This document listed 32 unsupported allegations of misconduct by Wallace in her interaction with Perry. Wallace was not given an opportunity to refute the allegations. (ECF No. 1 at ¶ 108.) On June 3, 2017, Wallace filed a complaint with the CHRO's Board of Commissioners against Sharp and Hughes regarding their conduct in the investigation and the issuance of the two counseling memoranda. (ECF No. 1 at ¶

109.)  The Board referred the complaint to the DOL.  (ECF No. 1 at ¶ 109.)  On September 8, 2017, the DOL issued a report concluding that there was no evidence that Sharp and Hughes' interactions with Wallace were retaliatory.  (ECF No. 1 at ¶ 110.)  The report also noted that there was no evidence that Wallace had been hostile in her interactions with Perry.  (Id.)   The CHRO Board of Commissioners dismissed Wallace's complaint against Sharp and Hughes without giving her an opportunity to rebut the inaccuracies in the report.  (ECF No. 1 at ¶ 111.)

<u>Performance Review- December 2017</u>

In December 2017, Sharp met with Wallace to provide her the quarterly Performance Assessment and Recognition System ("PARS") review.  (ECF No. 1 at ¶ 112.)  Sharp told Wallace she was rating her "needs improvement" in the category of compliance with statutory time frames.  (ECF No. 1 at ¶ 113.)  Sharp falsely claimed that in 44% of the cases assigned to the Capitol Region during the period of July 2017 – September 2017, mediations were not scheduled within 60 days of the Case Assessment Review ("CAR") retentions.  (ECF No. 1 at ¶ 113.)  However, in all the cases in the Capitol Region, mediations were scheduled simultaneously with the CAR retentions in compliance with the statutory requirements.  (ECF No. 1 at ¶ 114.)  In addition, although not required, nearly all mediations were held, not just scheduled, within 60 days of CAR retentions or shortly thereafter. (ECF No. 1 at ¶ 114.)  During her meeting with Wallace, Sharp stated that she suspected that the data she relied on to rate Wallace's performance as "needs improvement" were inaccurate but proceeded to issue the rating.  (ECF No. 1 at ¶ 116.)  Wallace asked Sharp to disclose the data upon which she was relying but Sharp refused and directed Wallace to prove her wrong.  (ECF 1 at ¶¶ 117-18.)  A few days later, Wallace emailed a detailed report to Sharp proving that every mediation in the Capitol Region was scheduled within the 60 day statutory timeframe.  (ECF 1 at ¶ 119.)  Wallace also emailed a copy to her attorney.  (ECF 1

at ¶ 121.)  The report did not include any facts of the cases, copies of the complaints, opinions or conclusions of the investigators, conclusions of the Regional Managers, or communications between investigators and the parties.  (ECF No. 1 at ¶ 120.)  Sharp refused to correct the false performance review or disclose the faulty data upon which she relied.  (ECF No. 1 at ¶ 122.) Wallace requested that Sharp correct the erroneous PARS and stop the retaliation against her. (ECF No. 1 at ¶ 123.)  Sharp in turn asked the DOL to investigate Wallace for her objections to the PARS rating, including her objection to retaliation.  (ECF No. 1 at ¶ 124.)  On January 2, 2018, Wallace was notified that she was the subject of an investigation regarding her objections to the PARS and that the investigation included her allegation of retaliation.  (ECF No. 1 at ¶¶ 126, 129.) In advance of the investigatory interview with the DOL, Wallace sent the DOL a copy of the report she had prepared demonstrating that the Capitol Region had met all mediation scheduling timeframes.  (ECF No. 1 at ¶ 130.)

At the meeting on January 19, 2018, the DOL presented Wallace with a chart Sharp had prepared that incorrectly reflected 188 cases for CAR retention in the Capitol Region.  (ECF No. 1 at ¶ 128.)  The correct number was 84.  (Id.)  In addition, Sharp's chart incorrectly showed that 44% of the mediations were not scheduled within 60 days when, in fact, none of the mediations in the Capitol Region were scheduled more than 60 days after CAR retention.  (Id.)

Suspension – January 2018

During the January 19, 2018 meeting with the DOL, Wallace explained the reports that she had prepared.  (ECF No. 1 at ¶ 132.)  The DOL provided Sharp and Hughes the recording and transcript of the interview with Wallace in which she described her claim of retaliation and alleged, for the first time, that she had been subjected to discrimination.  (ECF No. 1 at ¶ 133.)  On January 23, 2018, Wallace told the DOL that Sharp and Hughes had retaliated against her for having

objected to their falsification of case processing data.  (ECF No. 1 at ¶ 135.)  On January 29, 2018, Wallace learned that Hughes wanted to meet with her that afternoon.  (ECF No. 1 at ¶ 137.) Wallace emailed Hughes asking what the meeting was about and asking her to contact Wallace's attorney if the meeting concerned the ongoing investigation by the DOL.  (ECF No. 1 at ¶ 138.) Wallace was then marched out of her office and placed on administrative leave.  (ECF No. 1 at ¶ 139.)  She was ordered not to communicate with any CHRO employees except for Sharp and Hughes.  (Id.)

Expansion of the investigation

On February 2, 2018, Wallace's attorney received a letter from Hughes claiming that Wallace had breached confidentiality and ordering him to destroy any copy of the reports.  (ECF No. 1 at ¶ 140.)  Hughes claimed that Wallace had violated Conn. Gen. Stat § 46a-83(j), which prohibits disclosure of "what has occurred in the course of [the Commission's] endeavors" in the processing of a complaint.[1]  (ECF No. 1 at ¶ 141.)  Sharp and Hughes had an established practice of providing Wallace's attorney with information on what had occurred in the course of pending CHRO cases in connection with their efforts to oppose grievances initiated by Wallace.  (ECF No. 1 at ¶ 143.)  They repeatedly disclosed information on pending CHRO cases to plaintiff's attorney when it suited their purposes in opposing Wallace's objections to their unfair performance reviews. (ECF No. 1 at ¶ 144.)  The information that Wallace included in the reports at issue did not include information as to "what has occurred in the course" of CHRO investigations.  (ECF No. 1 at ¶

---

[1] Conn. Gen. Stat. § 46a-83(j) (2015) provides: "No commissioner or employee of the commission may disclose, except to the parties or their representatives, what has occurred in the course of such endeavors, provided the commission may publish the facts in the case and any complaint which has been dismissed and the terms of conciliation when a complaint has been adjusted. Each party and his representative shall have the right to inspect and copy documents, statements of witnesses and other evidence pertaining to the complaint, except as otherwise provided by federal law or the general statutes."

145.)  But the information Sharp and Hughes disclosed to Wallace's attorney did include such information.  (Id.)  Disciplining and terminating Wallace's employment for allegedly violating Conn. Gen. Stat.§ 46a-83(j) was a pretext for retaliation against Wallace for objecting to the use and dissemination of false case processing reports.  (ECF No. 1 at ¶ 151.)  On February 13, 2018, the DOL conducted an investigatory interview of Wallace, and attempted to question Wallace about personal use of her state-issued computer and email account.  (ECF No. 1 at ¶ 152.) Wallace's attorney objected to the expansion of the investigation.  (ECF No. 1 at ¶ 153.)  Wallace's personal use of her state-issued computer and email account was similar to that of CHRO's other three regional directors, who were not investigated or disciplined.  (ECF No. 1 at ¶ 154.)

<u>Termination</u>

On March 16, 2018, the DOL investigator recommended that Wallace be terminated and issued an investigatory report falsely claiming that Wallace had transmitted confidential CHRO information through her state-issued email account to her attorney.  (ECF No. 1 at ¶ 158.)  On March 29, 2018, the DOL conducted a pre-disciplinary hearing.  (ECF No. 1 at ¶ 159.)  Wallace objected and provided a statement refuting the claims against her.  (ECF 1 at ¶ 159.) On April 6, 2018, Hughes terminated Wallace's employment effective April 20, 2018, falsely stating that Wallace had (a) "deliberately violated policies on the use of [her] state email account and the state network, by sending numerous non-business related emails;" (b) "on multiple occasions and in voluminous amount in violation of C.G.S. § 46a-83(j) [she] had released to [her attorney] . . . information on active CHRO cases;" and (c) "that [she] had acted in an offensive manner to me, Tanya Hughes, on January 29, 2018, when via email, [she] instructed me to contact [her] attorney if I wished to meet with [her]."  (ECF 1 at ¶ 161.)  Hughes also falsely stated that Wallace presented no new or mitigating evidence during the pre-disciplinary hearing.  (Id.)  Hughes terminated

Wallace even though she lacked the statutory authority to do so under Conn. Gen. Stat. § 5-240(c) because the CHRO's Board of Commissioners had not designated Hughes with firing authority under Conn. Gen. Stat. § 5-196(3). (ECF No. 1 at ¶ 162.)

## II.    LEGAL STANDARD

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard is not a probability requirement. *Id.* "Although allegations that are conclusory are not entitled to be assumed true, . . . [w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Lynch v. City of New York*, No. 18-1247-CV, 2020 WL 1036620, at *5 (2d Cir. Mar. 4, 2020) (internal quotation marks and citations omitted). "The court must also 'construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff.'" *Id.* (citation omitted).

## III.    DISCUSSION

### A.    Count 2:  First Amendment Retaliation

Wallace alleges that Sharp and Hughes retaliated against her on the basis of her protected speech in violation of the First Amendment. Specifically, she alleges that from May to September 2014, she reported and protested the use and dissemination of false and misleading data regarding the number of cases closed by the Capital Region, that this speech was protected by the First Amendment, and that Sharp and Hughes retaliated against her. (ECF No. 1 at ¶¶ 26-33, 170, 172;

ECF No. 19 at 17.)

A plaintiff claiming retaliation in violation of the First Amendment "must plausibly allege that '(1) [her] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [her]; and (3) there was a causal connection between this adverse action and the protected speech.'" *Montero v. City of Yonkers, N.Y.*, 890 F.3d 386, 394 (2d Cir. 2018) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)).

I need not decide whether Wallace's speech was protected because her claim fails for another reason: she has not alleged facts showing a causal connection between her protected speech and the alleged retaliatory acts that fall within the applicable statute of limitations period.[2]

## 1.     Adverse Actions Falling within the Statute of Limitations

Invoking the three-year statute of limitations applicable to the First Amendment retaliation claim, *Matthews v. Connecticut, Dep't of Pub. Safety*, No. 3:10CV325(MRK), 2010 WL 3984645, at *5 (D. Conn. Oct. 8, 2010), the Defendants argue that Wallace's First Amendment retaliation claim is time-barred with respect to any alleged adverse actions that occurred before March 2016 because Wallace filed her complaint in March 2019.  Wallace responds that she "has alleged numerous actions within the applicable limitation period[]" and "[t]he fact that she includes background information to show a pattern or practice of retaliation dating back to her protected speech in no way causes these actions to somehow fall outside of the limitations period[]."  (ECF No. 19 at 10.)  To assess the Defendants' argument, I must examine the factual allegations to identify those adverse actions as to which Wallace knew or had reason to know of the alleged harm

---

[2] "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n. 12 (2d Cir. 2014).  Here, the facts pertinent to the statute of limitations issue are set forth in the complaint.

before the beginning of the three-year limitations period. *Shomo v. City of New York*, 579 F.3d 176, 179 (2d Cir. 2009) ("A Section 1983 claim ordinarily accrues when the plaintiff knows or has reason to know of the harm")(internal quotation marks omitted); *see also Birch v. City of New York,* 675 Fed. Appx. 43, 44 (2d Cir. 2017)(noting, in First Amendment retaliation case, that "[b]ecause the complaint was filed on January 5, 2016, any claims based on acts prior to January 5, 2013, would normally be found untimely.").[3]

A defendant's conduct constitutes adverse employment action for purposes of a First Amendment retaliation claim if the conduct "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotations omitted). "An adverse employment action may include discharging, refusing to hire, refusing to promote, demoting, reducing the pay, or

---

[3]  Wallace does not invoke the continuing violation doctrine, and I find it inapplicable in any event. The continuing violation doctrine "applies not to discrete unlawful acts, even where those discrete acts are part of a 'serial violation,' but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (internal alterations omitted); *see also Shomo*, 579 F.3d at 181 ("When the plaintiff brings a Section 1983 claim challenging a discriminatory policy, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it. . . . To trigger the continuing violation doctrine when challenging discrimination, the plaintiff must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy.") (internal quotation marks and citations omitted). Wallace does not challenge a single practice or policy but, instead, a series of discrete, allegedly retaliatory events. "Such discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Birch*, 675 F. App'x at 44–45 (internal quotation marks, citations and footnote omitted) (although plaintiff "attempts to preserve his claims on the ground that all of the retaliatory acts were part of a single practice and pattern that continue[d] into the statutory [limitations] period," the Court held continuing violation doctrine inapplicable because complaint was based primarily on series of discrete alleged retaliatory events despite allegation of "continuous practice and pattern."); *Smith v. New York City Dep't of Educ.*, 524 F. App'x 730, 732 (2d Cir. 2013) (Plaintiff's "claims of First Amendment retaliation arising out of acts occurring prior to November 6, 2006 are barred by the three-year statute of limitations. . . . [Plaintiff's] reliance on the continuing violation doctrine to avoid dismissal of these claims is misplaced, as each of the allegedly retaliatory events was a discrete action, not an 'ongoing policy' of retaliation.").

reprimanding an employee." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 401 (2d Cir. 2018) (citation omitted). "This list of retaliatory conduct is certainly not exhaustive, however, and 'lesser actions may also be considered adverse employment actions.'" *Zelnik*, 464 F.3d at 226. Here, Wallace alleges discrete retaliatory acts that might deter a person "of ordinary firmness" in her position from exercising her rights, but several of these occurred before March 2016, including a September 2014 investigation of a false charge that she had accused another department of "stealing credit," a November 2014 investigation of an "unfounded" complaint, an April 2015 investigation into her attendance, and a summer 2015 investigation into Salerno's complaint. Wallace's retaliation claims arising from these pre-March 2016 acts are time-barred.

## 2. Causation

Defendants next argue that Wallace fails to plausibly allege a causal connection between her allegedly protected speech in 2014 regarding incorrect case closure statistics and the nontime-barred alleged adverse actions – including the May 2016 J.C. complaint, the April 2017 Charles Perry complaint, the December 2017 PARS evaluation, the January 2018 suspension, the subsequent expansion of the investigation, and her March 2018 termination. I agree.

"The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999), *abrogated on other grounds as recognized by Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012) (citation omitted). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (citing *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)). In this

case, Wallace alleges that she engaged in protected speech in May – September 2014. Her earliest, non-time-barred alleged retaliatory actions occurred in May 2016. Although the Second Circuit "has declined to draw a bright line as to how close in time the events must be" to establish causation, *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019), "generally speaking it is a question of months, not years." *Milardo v. Town of Westbrook*, 120 F. Supp. 3d 206, 222 (D. Conn. 2015). *See Kiernan v. Town of Southampton*, 734 F. App'x 37, 43 (2d Cir. 2018) ("No bright line defines the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, but a causal inference may be drawn when the speech and adverse action occur within a five-month period.") (internal quotation marks omitted); *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (inferring causation based on a six-month lapse between protected speech and alleged retaliatory actions); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 555 (2d Cir. 2001) (same based on five-month lapse). The interval in this case – nearly two years – is too long, by itself, to support an inference of causation. *See Birch,* 675 Fed. Appx. at 45 (where "Birch's earliest, non-time-barred retaliatory action occurred at least seventeen months after Birch's most recent exercise of protected speech," "[t]his interval [was] too long to support an inference of causation."); *Burkybile v. Bd. of Educ.*, 411 F.3d 306, 314 (2d Cir. 2005) (declining to find a causal connection when "more than a year passed between [the plaintiff's] accusations ... and the initiation of disciplinary proceedings.")

Furthermore, the complaint is devoid of other factual allegations suggesting that the post-March-2016 actions by the defendants were motivated by Wallace's 2014 protests about case closure statistics. There are no allegations, for example, that Hughes or Sharp or anyone else cited Wallace's 2014 comments in taking any of the post-March-2016 actions or that those actions somehow related to case closure statistics. In short, the complaint does not set forth facts that

make it plausible that Wallace's 2014 statements about case closure statistics caused any of the post-March 2016 retaliatory acts alleged in the complaint.

## B.    Count 3:  Equal Protection

Wallace does not assert that she was discriminated against as a member of a protected class. Instead, she asserts an equal protection claim alleging that Sharp and Hughes "intentionally singled [her] out for adverse treatment that was entirely irrational and wholly arbitrary as compared to other Regional managers similarly situated to [plaintiff]" and that "[t]here was no rational basis for the disparate treatment to which all Defendants subjected Wallace."  (ECF No. 1 at ¶¶ 177-78.)[4]  She describes this claim as one for "selective enforcement."  (ECF No. 19 at 20.)

"To state an equal protection claim based on the theory of selective enforcement, a plaintiff must demonstrate: '(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as . . . to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.'"  *Marom v. Town of Greenburgh*, No. 18 CIV. 7637 (JCM), 2020 WL 978514, at *6 (S.D.N.Y. Feb. 28, 2020) (quoting *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019)).  To satisfy the similarity standard, "the plaintiff's and comparator's circumstances must bear a reasonably close resemblance. . . . They need not, however, be identical. . . . A plaintiff can prevail by showing that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  *Hu v. City of New York*, 927 F.3d 81, 96 (2d Cir. 2019)(citations and internal quotation marks omitted).

---

[4] Plaintiff clarifies in her opposition that she is not pursuing a "class of one" claim under *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).  (ECF No. 1 at 12 n. 4 and at 20 n.5.)

Defendants argue that Wallace's claim should be dismissed because she "fails to identify other similarly situated persons under substantially similar circumstances who were treated differently by [the defendants.]"  (ECF No. 14-1 at 22, 39.)  I disagree.  Wallace alleges that she was placed on administrative leave and terminated because she disclosed "confidential information" via email to her attorney.  She further alleges that Sharp and Hughes also emailed Wallace's attorney similar information but were not disciplined.  (ECF No. 1 at ¶¶ 148, 150.)  Wallace's allegations are sufficient to state a plead a plausible selective enforcement equal protection claim.

## C.      Count 4:  Intentional Infliction of Emotional Distress

Wallace asserts an intentional infliction of emotional distress claim as to the CHRO, Sharp, and Hughes.  (ECF No. 1 at ¶¶ 183-185.)  Defendants move to dismiss on the grounds that Wallace fails to allege sufficient facts to support the claim.  In response, Wallace points to her allegations that Sharp and Hughes "browbeat[] [her] during an interrogation on April 26, 2017, to the point where Wallace suffered an anxiety attack" and "had to seek medical advice," and that Hughes taunted her that "this is not Pekah's little sanctuary," and issued her a counseling memorandum accusing her of "unnecessary escalation" and simulated crying."  (Doc. #19 at 22.)

"In Connecticut, to state a claim of intentional infliction of emotional distress, Plaintiff must allege: (1) that the Defendant intended to inflict emotional distress or knew or should have known that such distress was a likely result of its conduct; (2) that the conduct was extreme and outrageous; (3) that the Defendant's conduct was the cause of Plaintiff's distress; and (4) that the emotional distress sustained by the Plaintiff was severe."  *Watkins v. City of Waterbury Bd. of Educ.*, No. 3:19CV593(KAD), 2020 WL 1184783, at *2–3 (D. Conn. Mar. 11, 2020)(citations omitted).  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme

and outrageous is initially a question for the court to determine." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000). "Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society . . . ." *Id.* at 210–11 (internal quotation marks and citations omitted). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'". *Id.* (quoting 1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965).) "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Id.* (internal quotation marks and citation omitted). "Both federal and state courts in Connecticut have interpreted the qualification of 'extreme and outrageous conduct' strictly." *Mercado v. Prrc, Inc.*, No. 3:15CV637(JBA), 2015 WL 6958012, at *2 (D. Conn. Nov. 10, 2015) (internal quotation marks and citation omitted).

Even assuming Wallace's allegations are true and drawing all inferences in her favor, I conclude that she has not stated a plausible claim of intentional infliction of emotional distress. Defendants are alleged to have taken various retaliatory actions against her including launching investigations against her, interrogating her and her staff, and terminating her employment. But even if proven, the conduct and the motive combined do not amount to "atrocious" conduct or conduct that is "utterly intolerable in a civilized community." *See , e.g.*, *Appleton*, 254 Conn. at 211 (IIED claim failed where defendants made condescending comments about plaintiff in front of colleagues, questioned plaintiff's vision and ability to read, informed plaintiff's daughter that

she was acting differently and should take time off, asked police to escort plaintiff from school, required plaintiff to subject herself to psychiatric testing, forced plaintiff to take leave of absence, suspended plaintiff, and forced plaintiff to resign); *Watkins v. City of Waterbury Bd. of Educ.*, No. 3:19CV593(KAD), 2020 WL 1184783, at *3 (D. Conn. Mar. 11, 2020)(plaintiff's allegations failed to rise to the level of extreme and outrageous conduct where defendant failed to promote the plaintiff, ignored her, failed to provide her training or leadership opportunities, "effectively demoted" her, taking away some of her leadership and training duties, and acted with either a discriminatory or a retaliatory motive). Plaintiff's allegations suggest that she had ongoing tensions with her supervisors, and that they engaged in a series of mostly petty acts aimed at unfairly criticizing her and undermining her authority, as well as in an ultimately successful effort to terminate her employment. But there are no allegations suggesting violence, injuries to a child or other vulnerable person, unusually harsh race-based or sex-based harassment, or other conduct of the sort that exceeds the sort of boorish behavior that unfortunately occurs from time to time in the workplace. The allegations simply do not arise to the level of extreme and outrageous conduct required to state a plausible claim for intentional infliction of emotional distress under Connecticut law, and the motion to dismiss Count 4 is granted.

**D.     Count 6: Defamation**

Wallace alleges that Sharp and Hughes "knowingly, intentionally and maliciously publicized false statements, both verbal and written, regarding Wallace to, *inter alia*, the Commissioners of the CHRO, which were harmful and injurious to [her] business reputation." (ECF No. 1 at ¶ 191.) She further alleges that the defendants knew the statements were false or acted with reckless disregard as to their falsity. (ECF No. 1 at ¶ 192.) Defendants argue that Wallace fails to allege sufficient facts to support a defamation claim. (ECF No. 14-1 at 44.)

"A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627, (2009) (internal quotation marks omitted). "To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Id.* at 627–28 (internal quotation marks and citation omitted). Statements that "charge improper conduct or lack of skill or integrity in one's profession or business and are of such a nature that they are calculated to cause injury to one in his profession or business" are defamatory. *Gaudio v. Griffin Health Servs. Corp.*, 249 Conn. 523, 544 (1999) (internal quotation marks and alterations omitted).

In her opposition, Wallace argues that she has sufficiently alleged falsity and points to (1) Sharp's statements in the May 1, 2017 counseling memorandum that Wallace's performance was unsatisfactory, that Wallace failed to follow a directive, was insubordinate, and demonstrated a lack of cooperation, and that she unnecessarily escalated matters and engaged in simulated crying (ECF No. 1 at ¶ 107), (2) Sharp and Hughes' May 4, 2017 counseling memorandum that included "32 unsupported allegations of misconduct" (ECF No. 1 at ¶ 108), and (3) Sharp's statement in Wallace's December 2017 performance review that she failed to comply with statutory time frames. (ECF No. 1 at ¶¶ 113-14.) As for publication, Wallace contends that intra-corporate communications are sufficient to constitute publication of a defamatory statement and that because these were formal employment documents, it may be reasonably inferred that they were placed in her personnel file. (ECF No. 19 at 24.) *See Torosyan v. Boehringer Ingelheim Pharm., Inc.*, 234

Conn. 1, 27–28 (1995) (publication shown where allegedly defamatory statement about the plaintiff "had been communicated among the plaintiff's supervisors and had been included in the plaintiff's personnel file"). I agree and find that Wallace has sufficiently pled a defamation claim. The motion to dismiss count 6 is denied.

## E.    Injunctive Relief

In her prayer for relief, Wallace seeks, among other things, an injunction reinstating her to her position and preventing Defendants from taking any retaliatory actions against her.[5] (ECF No. 1 at 38.) Defendants move to dismiss this request for relief, asserting that it is not prospective and therefore is barred by the Eleventh Amendment. This is incorrect. *See Dwyer v, Regain*, 777 F.2d 825, 836 (2d Cir. 1985) ("The request that [plaintiff] be reinstated to his position is not barred by the Eleventh Amendment. Reinstatement is purely prospective injunctive relief that orders the state official to return the former employee to the state's payroll.").[6] I therefore deny the request to dismiss the claim for reinstatement.

---

[5] The caption of the complaint states that Hughes and Sharp are sued in both their official and individual capacities. Although Wallace indicates in her opposition that her § 1983 claims in counts 2 and 3 are against the Sharp and Hughes in their individual capacities and therefore are not barred by the Eleventh Amendment, *see* ECF No. 19 at 5-6, she does not address this in the context of her request for injunctive relief. At this juncture, in spite of her concession in her brief, I treat the request for reinstatement as an official capacity claim under *Ex parte Young*.

[6] Defendants argue in their reply brief that Wallace's request for injunctive relief fails because Wallace does not allege that either Hughes or Sharp has the authority to reinstate her. (ECF No. 20 at 3.) *See Schallop v. New York State Dept. of Law*, 20 F. Supp. 2d 384, 391 (N.D.N.Y. 1998) (the *Ex parte Young* exception to sovereign immunity does not authorize claims against officials for reinstatement where there are no allegations that the officials have authority to grant the plaintiff's request for reinstatement to former position). Hughes is the Executor Director of the CHRO and the individual who terminated Wallace's employment, although Wallace alleges that she did not have the authority to do so. In any event, I need not address this argument because Defendants raise it for the first time in their reply brief. *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir.1993) ("Arguments may not be made for the first time in a reply brief.").

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss counts 1, 2, 3 (as to CHRO) and 4 is GRANTED and DENIED as to count 3, count 6, and the request for injunctive relief.  Because no claims remain against it, CHRO is dismissed as a defendant.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                March 26, 2020